**Lynn SNAY, Plaintiff,**

v.

**U.S. POSTAL SERVICE and American Postal Workers Union Local 390, Defendants.**

**No. 97–CV–1531 (LEK/DRH).**

United States District Court, N.D. New York.

Nov. 23, 1998.

Office of Joseph P. McGovern, Joseph P. McGovern, of counsel, Albany, NY, for Lynn Snay.

U.S. Postal Service, Andrew L. Freeman, of counsel, Windsor, CT, for U.S. Postal Service.

O'Connell and Aronowitz, Bradley A. Sherman, of counsel, Albany, NY, for American Postal Workers Union Local 390.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

This action, brought against Plaintiff's former employer, the United States Postal Service ("USPS") and her former union, the American Postal Workers Union Local 390 ("the Union"), centers around USPS' refusal to have certain of Plaintiff's absences from work charged to the leave-time mandated by the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et al., Plaintiff's subsequent discharge for said absences, and the Union's alleged failure to properly grieve each action. Specifically, she alleges that the Union never filed her FMLA grievance and that the grievance based on her discharge (the "disciplinary grievance") was prematurely withdrawn. Plaintiff asserts that the Union thus breached its duty of fair representation ("DFR") and concealed its breach through fraudulent statements suggesting that the grievance process was ongoing after it had terminated.

Plaintiff brings three claims against USPS: breach of collective bargaining agreement ("CBA"), violation of the FMLA, and discrimination on the basis of gender and disability in violation of N.Y. Exec. Law ("Human Rights Law" or "HRL") § 296. She also brings claims against the Union for breach of the duty of fair representation and for disability and gender discrimination in violation of N.Y. HRL § 296. Defendants now move to dismiss the breach of CBA and breach of duty of fair representation claims pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds of untimeliness. They further move to dismiss the state law claims on the grounds of preemption.

### I. Standard of Review

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In assessing the sufficiency of a pleading, "all factual allegations in the complaint must be taken as true," *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991), and all reasonable inferences must be construed in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1099 (2d Cir.1988), *cert. denied sub nom., Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). "[C]onsideration is limited to the factual allegations in [the] complaint, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

### II. Background

On or around November 5, 1990, Plaintiff was hired by USPS as a full-time postal clerk. Starting around July of 1995, Plaintiff began taking a number of absences as a result of severe depression and in order to take care of Christopher Marczewski ("Marczewski"), a terminally ill co-worker with whom she was having a relationship.

In July of 1995, Plaintiff twice met with Kristen LaClair ("LaClair"), Plaintiff's immediate supervisor, and requested that her absences be applied to the twelve-weeks of leave mandated under the FMLA. LaClair

stated that "if plaintiff needed the time off under these circumstances to go ahead and take the time and not worry about it." Compl. ¶ 18.

On December 31, 1995, Marczewski died, and this event exacerbated Plaintiff's depression. As a result, she continued to take periodic absences. On each occasion when Plaintiff was absent from work, she contacted USPS and informed them of her absence.

*1. The First Grievance*

On February 29, 1996, Plaintiff received a letter from Peg Lynch ("Lynch"), Postal Service Time and Attendance Officer, informing her that her absences during February and March of 1996 and any subsequent absences would not be covered under the FMLA. On March 3, 1996, Plaintiff met with Barbara Epps ("Epps"), Union Shop Steward, and requested that a grievance be filed as a result of USPS' refusal to apply Plaintiff's absences to the FMLA. She then provided Epps with Lynch's letter and "other documentation" and Epps stated that she would file a grievance. Compl. ¶ 22. Plaintiff does not allege that she heard anything further on this matter. In September of 1996, when Plaintiff asked Epps to provide her with a copy of the FMLA grievance, Epps stated that she had the documentation at home. Later, however, Epps told the Plaintiff that she could not find the FMLA grievance nor "any information pertaining to it." Compl. ¶ 24. Plaintiff alleges that the grievance was never filed.

*2. The Second Grievance*

Around May 30, 1996, USPS served Plaintiff with a Notice of Removal, indicating that she would be discharged from service on July 6, 1996 for "failure to be regular in attendance." Compl. ¶ 25. The notice listed a number of absences since November 11, 1995 that were allegedly unscheduled.

Around May 30, 1996, Plaintiff met with Jim Walser ("Walser"), another Union Shop Steward, presented the Notice of Removal to him and requested the filing of a grievance. Around June 6, 1996, the Union filed a grievance disputing the disciplinary charge of unscheduled absences.

The grievance process, as established in the CBA, begins with a hearing between the employee's supervisor and either the employee, a Union representative or both. Compl. Exh. A. This is referred to as a "Step One" hearing. An adverse decision at this stage can be appealed to a "Step Two" hearing, which is decided by an outside official designated by USPS. *Id.* If the employee fails to obtain relief, she may appeal to "Step Three," which is addressed to the "Grievance/Arbitration Processing Center." *Id.* An employee also has a fourth step appeal which is not relevant to this action.

On June 10, 1996, a "Step One" grievance hearing was held, and Plaintiff's grievance was denied. It is not clear from the complaint whether or not Plaintiff was in attendance or whether she was informed of the outcome. The Union appealed the denial, and on June 21, 1996, a "Step Two" hearing was held. Plaintiff was not invited to attend this hearing or nor was she formally apprised of the results.

On July 6, 1996, Plaintiff's employment was suspended. On July 8, 1996, Plaintiff told Walser and Roger O'Rourke ("O'Rourke"), the president of the Union, that in order to get back to work, she would be willing to settle for a "last chance agreement," but Walser and O'Rourke discouraged this course of action, stating that "they could do better and that it was not necessary to jeopardize her career." Compl. ¶ 33.

In late July, Plaintiff spoke again to O'Rourke about the disciplinary grievance. Plaintiff suggested that O'Rourke raise the issue of the charges with Nunzio Hughes ("Hughes"), a Postal Service Supervisor.[1] O'Rourke stated that he would try to bring the issue up during "his next meeting in late July and August 1996." Compl. ¶ 35. In August, Plaintiff asked O'Rourke about the results of the meeting. O'Rourke responded that he had discussed Plaintiff's employment with Hughes and was waiting to back from him. Plaintiff suggested that she contact Hughes directly, but O'Rourke replied:

---

1. It is not clear from the Complaint whether Hughes was Snay's Supervisor at this time.

" 'No, I'll try and if I have [to] I will set up [a] meeting [with] the two of us.' " Compl. ¶ 36.

In October of 1996, Plaintiff and her sister met with O'Rourke again, asking him about the status of the disciplinary grievance. He repeatedly stated that " 'these things take time.' " Compl ¶ 37. He further told her that he had received part of the "Step Three" appeal back and was " 'waiting for the other part.' " Id. On several occasions thereafter, Plaintiff telephoned the Union and was told by O'Rourke that "he had not heard anything regarding the grievance process and that these things take time." Compl. ¶ 38.

On March 13, 1997, Plaintiff received a letter from USPS terminating her employment. She contacted Diane Connelly ("Connelly"), an employee in the Postal Service Human Resources Department, and "questioned her termination in light of the pending grievance and arbitration process." Compl. ¶ 39. Connelly told her that she should speak to O'Rourke because she "may no longer be represented by the Union." Id. Plaintiff also heard a rumor from an unspecified source that the Union may not have filed the "Step Three" appeal.

After unsuccessfully trying to reach O'Rourke, Plaintiff attended a Union meeting in late March at which she met with Joe Harding ("Harding"), the Union's Vice-president. Plaintiff informed Harding that she had received a final termination notice and that O'Rourke was not returning her calls. Harding stated that he was not aware of her situation but that he would relay her message to O'Rourke. Two days later, Harding informed her that he had relayed the message. However, Plaintiff did not receive any response from O'Rourke.

Plaintiff then secured legal counsel, who first sent a letter on April 16, 1997 to a USPS employee inquiring about the status of the grievance. By letter dated April 28, the employee wrote back directing Plaintiff's attorney to contact O'Rourke. The attorney sent a letter to O'Rourke on May 6, 1997 and

after receiving no response, sent a second letter on June 3, 1997. On or around June 21, 1997, O'Rourke wrote back, stating in part that " '[Snay's] grievance was withdrawn after Step 2.' " Compl. ¶ 47. The letter further stated that Plaintiff had failed to cooperate and provide necessary documentation. Plaintiff commenced this action on October 20, 1997.

## III. Discussion

### A. Untimeliness of Breach of CBA/Breach of Duty of Fair Representation Claims

#### 1. Legal Standard

The Supreme Court has held that in an action where employees sue both their employer for breach of the collective bargaining agreement ("CBA") pursuant to § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (1982) and their union for breach of the duty of fair representation (so-called "hybrid" actions), the action has a six-month statute of limitations period.[2] See DelCostello v. International Broth. of Teamsters, 462 U.S. 151, 169–171, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (adopted limitations period provided by Section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b)). The Second Circuit has held that this period "begins to run when a plaintiff knows or reasonably should know that the union has breached its duty of fair representation." Flanigan v. IBT, Truck Drivers Local No. 671, 942 F.2d 824, 827 (2d Cir.1991); see also Demchik v. General Motors Corp., 821 F.2d 102, 105 (2d Cir.1987) ("the statute of limitations begins to accrue ... when the employee had actual or constructive notice that the union has breached its duty of fair representation.").

■ A "subsidiary question" of whether the employee has "reason to know" of the claim is "whether he exercised due diligence to discover [it]. . . ." Kronisch v. United States, 150 F.3d 112, 124 (2d Cir.1998) (quoting Guccione v. United States, 670 F.Supp.

---

2. Actions brought by post-office employees based on a collective bargaining agreement are governed by 39 U.S.C. § 1208. However, the language of this provision is substantially identical

to that of § 301 of the LMRA, and cases interpreting the latter statute apply to the former. See Miller v. U.S. Postal Service, 985 F.2d 9, 10 n. 1 (1st Cir.1993).

527, 536 (S.D.N.Y.1987), *aff'd on other grounds*, 847 F.2d 1031 (2d Cir.1988)); *see also Lucas v. Mountain States Telephone & Telegraph*, 909 F.2d 419, 421 (10th Cir.1990) (holding that hybrid claim accrues when the plaintiff "knows or in the exercise of reasonable diligence, should have known of that union's decision or action."); *Stone v. Writer's Guild of America West, Inc.*, 101 F.3d 1312, 1314 (9th Cir.1996) (same); *Wilson v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL—CIO*, 83 F.3d 747, 757 (6th Cir. 1996) (same); *Pantoja v. Holland Motor Express, Inc.*, 965 F.2d 323, 327 (7th Cir.1992) (same).[3] The requirement of "reasonable diligence" mandates that "[a] plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed." *Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir.1988).

### 2. Plaintiff's FMLA Grievance

■ Regarding the Union's alleged failure to file the FMLA grievance, it is not necessary to determine precisely when Plaintiff knew or should have known of this action. There is no basis for concluding that Plaintiff had reason to know of the breach at any time prior to her initiation of the disciplinary grievance on May 30, 1996, and accrual was tolled thereafter by the second grievance itself. When a union represents an employee in a grievance proceeding, a claim challenging the adequacy of that union's representation does not accrue until the employee knows or should have known of the outcome of that process. *See Lucas v. Mountain States Telephone & Telegraph*, 909 F.2d 419, 421 (10th Cir.1990) (applying general rule that claim accrues when claimant "knows or in the exercise of reasonable diligence should

have known" of the union's acts to specific case where the union continues to represent the employee after the improper acts); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir.1986) ("[W]here a duty of fair representation seeks to overturn an unfavorable arbitration award on the ground that the union committed errors in the arbitration proceedings, the claim accrues when the employee learns of the arbitrator's award."); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir.1989) (knowledge of a breach of duty by a union in the course of an arbitration proceeding "will not be attributed to [the employee] prior to the issuance of the award."). This rule reflects a belief that an employee who may yet obtain the relief she seeks from an ongoing employment dispute-resolution process should not be compelled to initiate a judicial process to obtain the same relief:

> It is quite possible that, missing witness or inadequate cross-examination notwithstanding, the employee would prevail in the arbitration proceeding, perhaps obtaining reinstatement and back-pay. In such a case, intervention by the district court would be unnecessary, superfluous and wasteful.

*Ghartey*, 869 F.2d at 163. Thus, the tolling applies where "the possibility exists that an employee could be made whole by the grievance process" notwithstanding a Union's breach of their duty of fair representation. *Lucas*, 909 F.2d at 421.

■ Here, that possibility existed when the second grievance was initiated. Although the disciplinary grievance was not based directly on USPS' refusal to excuse Plaintiff's absences as FMLA leave-time, Plaintiff's grievance against her discharge for unexcused absences would necessarily have had to address and resolve the same issue and thus could have provided Plaintiff with

---

**3.** In the context of analyzing the accrual of "hybrid" actions, the Second Circuit has not expressly linked the "reasonable diligence" obligation to the "reason to know" standard. However, when considering whether a union's fraudulent concealment of its breach of duty tolls the running of the limitations period, the court has noted that "[f]raudulent concealment is predicated on a union deliberately misleading

the plaintiff about a breach which he failed to discover during the limitations period *despite the exercise of reasonable diligence.*" *Cohen v. Flushing Hosp. and Medical Center*, 68 F.3d 64, 69 (2d Cir.1995). It would be illogical to suppose that a plaintiff had the obligation of reasonable diligence only when the union engaged in fraud, since this would actually reward the union's attempt at concealment.

the relief that was denied to her by the Union's failure to bring the first grievance. Therefore, the limitations period for Plaintiff's claims based on the failure to bring the FMLA grievance began to run when Plaintiff knew or should have known of the outcome of her disciplinary grievance, and the determination of that time will establish the timeliness of claims arising out of both of Plaintiff's grievances.

### 3. Plaintiff's Disciplinary Grievance

■ With regard to the disciplinary grievance, Defendants argue that Plaintiff knew or reasonably should have known that the Union had breached its duty of fair representation as early as July 6, 1996 when Plaintiff learned that she had been suspended. They further argue that Plaintiff's claim accrued no later than March 13, 1997 when she learned that she had been discharged, was told by a USPS employee that she "may" no longer be represented and heard a rumor from an unspecified source that the grievance may not have been appealed to the third stage.

Taking the July 6, 1996 suspension first, Defendants do not explain why Plaintiff should have known of the breach at this time, i.e. why she should have known based on the suspension that the denial of her grievance had not been appealed. Certainly, O'Rourke did not hint at this fact during the two meetings Plaintiff had with him in July after the suspension. To the contrary, O'Rourke was positive about the results the Union could obtain for her.

■ Defendants rely most heavily on the March 13 events, including the fact of Plaintiff's discharge and the two statements made to her at that time. The statements are clearly insufficient to impute constructive knowledge of the breach. The USPS employee, Connelly, only stated that Plaintiff's Union "may" have ceased to represent her, and by directing Plaintiff to contact the Union to verify whether that was the case, made it evident that Connelly did not herself know. The "rumor" that Plaintiff's appeal was never made is even less of a support; there is no evidence that the speaker was in a position to

know whether the appeal was or was not ongoing.

Moreover, whether Plaintiff had constructive knowledge of a breach of duty by the Union must also take into account the statements of the Union representatives, particularly O'Rourke, the president. *Cf. King v. New York Telephone Co., Inc.*, 785 F.2d 31, 35 (2d Cir.1986) (finding that it was unreasonable to rely upon "vague oral assertions of low-level officials of the local union" when they were contradicted by higher level Union officials.) According to Plaintiff's complaint, Plaintiff was repeatedly told by O'Rourke, the Union president, that the grievance proceeding was ongoing. Plaintiff was entitled to rely on these statements made by a high-level Union official, notwithstanding statements to the contrary made by parties that were not even employed by the Union.

■ Defendants counter that any reasonable doubt as to the status of the grievance proceeding was erased when Plaintiff was discharged. They assert that, because a disciplinary action is delayed pending the resolution of a grievance brought against that action, Plaintiff should have known, based on her discharge, that her grievance proceeding on the Notice of Removal was not ongoing.

The CBA does establish that

[i]n the case of ... discharge, any employee ... shall remain either on the job or on the clock at the option of the Employer for a period of thirty (30) days. Thereafter, the employee shall remain on the rolls (non-pay status) until disposition of the case has been had either by settlement with the Union or through exhaustion of the grievance-arbitration process....

Compl. ¶ 56 (quoting CBA, Article 2, § 5). However, it is not clear that Plaintiff was aware of this right. Further, even if the Court were to find that Plaintiff's March 13 statement "question[ing] her termination in light of the pending grievance," Compl. ¶ 39, established that she was aware of it, or else that employees should be held constructively aware of the terms of their collective bargaining agreements, Plaintiff could not know whether USPS, whom she believed to have already breached the CBA in issuing the

Notice of Removal, had followed the terms of the CBA with regard to the grievance process.

▪ Arguably, the events of March 13 were sufficient to trigger the obligations of reasonable diligence. *See Kronisch v. U.S.,* 150 F.3d 112, 121 (2d Cir.1998) (under "reasonable diligence" requirement, "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." (citations omitted)). However, after March 13, Plaintiff *was* reasonably diligent in determining the status of her grievance. She contacted a representative at USPS, went physically to a Union meeting where she spoke to the Union Vice–President, attempted several times to contact O'Rourke and finally secured counsel who, after two letters, was able to determine that obtain the necessary information. These actions are clearly sufficient to constitute reasonable diligence. *See Cohen,* 68 F.3d at 69 (noting that diligence does not involve "anything particularly difficult, costly, or time-consuming"). Despite these efforts, it was not until June 21, 1997, when O'Rourke notified Plaintiff's attorney by letter that her grievance had been withdrawn, that Plaintiff actually knew or had reason to know of the breach. It follows that her federal claims did not accrue until that date, which was less than six months prior to the commencement of this action on October 20, 1997. Defendants' motions to dismiss the claims for breach of the CBA and breach of the duty of fair representation are therefore denied.

## B. Preemption of Discrimination Claims Against the Union

▪ The Union argues that Plaintiff's HRL claim for discrimination on the basis of gender and disability is preempted by the duty of fair representation. This duty is derived from sections 8(b) and 9(a) of the NLRA, 29 U.S.C. §§ 158(b) and 159(a), which authorize a union to act as the exclusive representative of all the employees in the collective bargaining process. As the employees' agent, a union owes each employ-ee the "duty of fair representation," i.e. the duty to act "without hostility or discrimination ... [in] complete good faith and honesty ... to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). State law claims are preempted if they attempt to impose obligations on a union that are subsumed by this duty. *See Condon v. Local 2944, United Steelworkers of America, AFL—CIO,* 683 F.2d 590, 595 (1st Cir.1982) (state-imposed duties on the union are preempted unless they "arise wholly outside the ambit of those obligations circumscribed by a union's duty of fair representation under the collective bargaining agreement"); *Peterson v. Air Line Pilots Ass'n Int'l,* 759 F.2d 1161, 1169 (4th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985) (the preemption inquiry in "DFR" cases is "whether the duty of fair representation claim itself 'preempts' the power of the district court to exercise its pendent jurisdiction over related state law claims."); *Oliva v. Wine, Liquor and Distillery Workers Union, Local One,* 651 F.Supp. 369, 371 (S.D.N.Y.1987) (fraud claim was "nothing more than recharacterization[ ]" of claim for breach of duty of fair representation (citations and internal quotations omitted)). Thus, if the state claim "creat[es] no new rights for an employee and impos[es] no new duty on a union not already clearly present under existing federal labor law," it is preempted. *Welch v. General Motors Corp., Buick Motor Div.,* 922 F.2d 287, 294 (6th Cir.1990) (quoting *Maynard v. Revere Copper Products, Inc.,* 773 F.2d 733, 735 (6th Cir.1985)).

In her complaint, Plaintiff alleges that the Union discriminated against her when it "failed to fully process plaintiff's grievances" and "misled and deceived plaintiff regarding the processing of her grievances." Compl. ¶ 80. Plaintiff also alleges that "[b]ut for plaintiff's female gender and disability, plaintiff would have been represented by Union in the processing of her FMLA and disciplinary grievances in a fair and honest manner." Compl. ¶ 83. Thus, the substance of her discrimination claim is that the Union breached their duty of fair representation by discriminating against her. Because the alleged discrimination was in connection with

the Union's activities as representative, the discrimination claim cannot be said to "arise wholly outside the ambit of those obligations circumscribed by a union's duty of fair representation under the collective bargaining agreement." *Condon*, 683 F.2d at 595. *See Jones v. Truck Drivers Local Union No. 299*, 838 F.2d 856, 861 (6th Cir.1988) ("Unfair representation … is unfair representation whether by reason of sex discrimination, handicap discrimination, or a willful breach of responsibility to carry out clear terms of a collective bargaining agreement for the benefit of union members and employees."). Plaintiff's state law claim against the Union is thus preempted by federal law and must be dismissed.

*C.   Preemption of Discrimination Claims Against USPS*

██ USPS argues that the sex and disability discrimination claims are also preempted, in this case by federal discrimination law. In *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Supreme Court held that section 717 of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–16, "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id.* at 835, 96 S.Ct. 1961. While Title VII does not cover disability discrimination, such claims, brought under state law by federal employees, are preempted in similar fashion by section 501 of the Rehabilitation Act, 29 U.S.C. § 791 (1994). *See Rivera v. Heyman*, 157 F.3d 101, 105 (2d Cir.1998) (affirming dismissal of New York HRL disability discrimination claim). Thus, Plaintiff's sex and disability discrimination claims against USPS must be dismissed.

Accordingly, it is

ORDERED that USPS' motion to dismiss is DENIED as to the First Cause of Action and GRANTED as to the Fifth Cause of Action; and it is further

ORDERED that the Union's motion to dismiss is DENIED as to the Third Cause of Action and GRANTED as to the Fourth Cause of Action; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.