**Richard B. NELLIS, et al., Plaintiffs,**

**v.**

**AIR LINE PILOTS ASSOCIATION, et al., Defendants.**

**Civ. No. 92–771–A.**

United States District Court, E.D. Virginia, Alexandria Div.

Nov. 3, 1992.

Joan Marie Canny, Caplin & Drysdale, Washington, D.C., for plaintiffs.

Harvey B. Cohen, Brian Patrick Gettings, Cohen, Gettings & Dunham, Arlington, Va., for defendants.

MEMORANDUM OPINION

ELLIS, District Judge.

This class action labor dispute presents a novel question regarding the scope of the preemptive effect of federal labor law. The plaintiff class, composed of airline pilots formerly employed by Eastern Air Lines, Inc. ("Eastern"), allege that their exclusive collective bargaining representative, the Air Line Pilots Association, International ("ALPA"), induced them to go on

strike by promising that ALPA would ensure that, in the event that assets of Eastern were sold and pilots were accordingly laid off, the pilots would be rehired with seniority by the airlines that acquired the assets. When this did not occur, plaintiffs brought this action, alleging a breach of the federally-created duty of fair representation, as well as several state causes of action.

The matter comes before the Court on the defendants' motion for dismissal of Counts II, III, and IV of the First Amended Complaint, all of which are premised on state law, on the ground that the claims therein are preempted by the federally created duty of fair representation. For the reasons detailed below, the Court grants the defendants' motion and dismisses Counts II, III, and IV of the First Amended Complaint.

### Facts

This class action is brought by nine named plaintiffs on behalf of themselves and a class of over 2,400 former Eastern pilots. This class consists of all pilots on the Eastern seniority list as of March 4, 1989, who went on strike on that date and remained on strike until November 22, 1989. The defendants are ALPA and ten of its former and present officials. ALPA was, at all times relevant to this action, the authorized bargaining representative of the plaintiffs. It is a unitary labor organization, with a single Constitution and By–Laws governing all subordinate bodies and members. At each of the operating airlines employing ALPA members, ALPA has a Master Executive Council ("MEC") composed of representatives elected from the pilot employees at that airline. The MEC's function as the coordinating council for the ALPA-represented employees at each airline.

Pursuant to its authority under ALPA's constitution, the ALPA Executive Board had adopted the so-called Fragmentation Policy prior to the strike. According to plaintiffs, the Fragmentation Policy obligated ALPA to take certain actions in the event that airline assets (*i.e.* aircraft, routes, etc.) were transferred from one ALPA-represented carrier to another. In particular, plaintiffs contend that the Fragmentation Policy required ALPA to negotiate with a purchaser of assets to ensure that pilots from the seller of those assets were hired with some form of pre-hire seniority, thereby providing those pilots with greater entitlements than they would otherwise have received as newly hired employees.

On March 4, 1989, the Eastern pilots went on strike against the airline. They allege that ALPA induced them to strike by assuring them that ALPA would meet and fulfill its obligations under the Fragmentation Policy. Five days after the commencement of the strike, Eastern filed a petition in the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101, *et seq.* From that time until January 18, 1991, Eastern continued to operate under the supervision of the bankruptcy court. During this period, with the approval of the bankruptcy court, Eastern leased and sold various assets to other carriers. Meanwhile, the Eastern pilots ended their strike on November 22, 1989. On January 18, 1991, Eastern ceased all operations and has since been in the process of liquidating its remaining assets. Plaintiffs allege that ALPA never fulfilled its Fragmentation Policy obligations to the pilots and never made good on the representations calculated to induce the pilots to strike. To the contrary, plaintiffs assert, ALPA, at the behest of the MEC's of the acquiring carriers, actively obstructed the plaintiffs' efforts to gain employment with pre-hire seniority.

In the present action, plaintiffs assert six counts on behalf of themselves and the class. In Count I they contend that ALPA has breached the federally mandated duty of fair representation. In Count II they allege a breach of contract, based on ALPA's failure to honor the provisions of the Fragmentation Policy. Count III is a quasi-contractual claim, asserting that the plaintiffs detrimentally relied on the defendants' promises to abide by the Fragmentation Policy. In Count IV, the plaintiffs

allege that the defendants intentionally and tortiously interfered with the plaintiffs' prospective employment relationships with airlines which would otherwise have hired them. Counts V and VI are not relevant to the present motion.[1] The defendants have moved to dismiss Counts II, III, and IV of the Complaint on the ground that these common law state claims are preempted by the federally established duty of fair representation.

### Analysis

Section 2(a) of the Railway Labor Act ("RLA") grants a duly elected union the exclusive authority to represent all employees in a collective bargaining unit. 45 U.S.C. § 152, Second. The federal courts have long held that the grant of this exclusive right implicitly imposes a corresponding duty on a bargaining representative. Thus, it is undisputed between the parties that " 'as the exclusive bargaining representative of the employees, ... the Union had a statutory duty fairly to represent all of those employees....' " *United Steelworkers of America v. Rawson,* 495 U.S. 362, 372, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990) (*quoting Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)). Under the duty of fair representation doctrine, ALPA's " 'statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, and to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *Id.* The Supreme Court has been careful to note, however, that "[a]ny

substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n, International v. O'Neill,* —— U.S. ——, ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991). As a result, the Court has stated that "a breach [of the duty of fair representation] occurs 'only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.' " *Rawson,* 495 U.S. at 372, 110 S.Ct. at 1911 (*quoting Vaca,* 386 U.S. at 190, 87 S.Ct. at 916.

ALPA acknowledges that its conduct toward the plaintiffs in this case is subject to the duty of fair representation. While ALPA will presumably argue that its actions did not violate the standard imposed by the duty of fair representation, ALPA does not contest that the plaintiffs have alleged sufficient facts in Count I of their Complaint to state a claim that ALPA has violated the duty. Instead, in the present motion, ALPA takes the position that the duty of fair representation defines the sole duty owed by the Union to the plaintiffs. ALPA contends that the federal duty of fair representation preempts any other duties that might otherwise be imposed on the Union by the operation of state law.

The issue of preemption of state law causes of action by the duty of fair representation has been treated extensively by the federal courts.[2] Despite the large body

---

1. Count V alleges that the individual defendants violated the statutory fiduciary duties imposed by 29 U.S.C. § 501. Count VI seeks an injunction terminating the custodianship ALPA established over the Eastern MEC and its subordinate bodies.

2. A significant factor leading to the proliferation of decisions on this issue is the fact that an analogous duty of fair representation has been implied under Section 9(a) of the National Labor Relations Act ("NLRA"). *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). Generally, RLA preemption of wrongful discharge claims is given wider scope than similar preemption under the NLRA. *See, e.g., Peterson v. Air Line Pilots*

*Ass'n, International,* 759 F.2d 1161, 1169 (4th Cir.) ("The scheme of remedies and procedures carefully crafted in the RLA has long been interpreted as evidence of congressional intent significantly to limit an aggrieved employee's right to resort to state law as an alternative remedy for a wrongful discharge.... Unlike preemption under the NLRA, the preemption of state law claims under the RLA has been more complete."), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). Because the instant case does not involve wrongful discharge, it does not implicate the "carefully crafted" remedies of the RLA. As a result, the complex arbitral process established by the RLA was not invoked in this case, and therefore, in the present context, preemption need be accorded no greater scope than

of law on this topic, or perhaps because of it, no universal standard has been established to govern the applicability of preemption. The status of the caselaw is particularly confusing because the courts have tended to blur two distinct concepts in their discussion of preemption. On the one hand, preemption operates to preserve the exclusive jurisdiction of the administrative agency charged with implementing the relevant statute (the National Labor Relations Board ("NLRB") with respect to the NLRA and, to a lesser extent, the National Mediation Board ("NMB") with respect to the RLA). *See, e.g., Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees of America v. Lockridge,* 403 U.S. 274, 288, 91 S.Ct. 1909, 1918, 29 L.Ed.2d 473 (1971) (finding preemption, in part, because "when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body...."). Preemption in this context is akin to the doctrine of primary jurisdiction.

A conceptually distinct situation arises where, as here, proper jurisdiction in federal court is undisputed, and the central issue is whether federal law preempts the substantive rights created by state law. The rationale advanced for preemption in the jurisdictional context is not automatically relevant when considering the preemption of substantive state law. Moreover, because the NLRB has jurisdiction over a much broader range of disputes than does the NMB, conclusions reached in the NLRA cases are not always instructive in the RLA context.

It is true that relevant principles of preemption may be gleaned from cases dealing with the exclusive jurisdiction of the NLRB. *See Peterson,* 759 F.2d at 1169 ("[W]e refer to [cases dealing with the exclusive jurisdiction of the NLRB] since we believe the risk of state interference with the effective administration of national labor policy is present here even though the exclusive jurisdiction of the arbitrator is not at issue.").[3] Nevertheless, "care must be taken to distinguish pre-emption based on federal protection of the conduct in question ... from that based predominantly on the primary jurisdiction of the National Labor Relations Board." *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 384 n. 19, 89 S.Ct. 1109, 1118 n. 19, 22 L.Ed.2d 344 (1969).

Clearly, under both the RLA and the NLRA, the duty of fair representation has some preemptive effect on substantive state law. *See, e.g., Vaca,* 386 U.S. at 177, 87 S.Ct. at 910 (complaint based on the duty of fair representation "alleged a breach by the Union of a duty grounded in federal statutes, and ... federal law therefore governs [the] cause of action."); *Peterson,* 759 F.2d at 1170 ("The importance of the federal interest is such that the duty of fair representation cause of action is governed exclusively by federal law even when the claim is filed in state court."). The difficult question posed by this case is whether the federal duty of fair representation defines the *sole* duty owed by a union to its members, or whether state law can impose other duties supplemental to the duty of fair representation and not preempted by it. Specifically, in this case, plaintiffs argue that the state common law of contract prohibited ALPA from making explicit enforceable promises to its mem-

warranted by the general principles of preemption, as developed in both the NLRA and the RLA cases.

3. Read literally, this passage from *Peterson* appears to beg the critical question. Whether or not a particular state law interferes with the maintenance of an effective national policy is the essential inquiry of preemption analysis. *Peterson* begins its analysis by assuming that such concerns are implicated, in order to justify

application of the NLRA cases. Not surprisingly, after starting from this assumption, the *Peterson* decision ultimately holds that preemption is warranted. Despite this apparent weakness in the court's reasoning, there can be no dispute that principles of preemption developed in the jurisdictional context can have applicability to the determination of federal preemption of substantive state law.

bers[4] and then reneging on those promises, even if such conduct was not sufficiently "arbitrary, discriminatory, or in bad faith" to satisfy the federal standard for breach of the duty of fair representation. Similarly, the plaintiffs contend that ALPA should be held liable under state doctrine of tortious interference with a prospective business relationship, for interfering with plaintiffs' efforts to acquire jobs with enhanced seniority, even if such conduct was not sufficiently "arbitrary, discriminatory, or in bad faith" to be a breach of the federal duty.

There is language in the relevant cases supportive of the plaintiffs' position. In *Rawson*, the Supreme Court stated, "We have never held, however, that as a matter of federal law, a labor union is *prohibited* from voluntarily assuming additional duties to the employees by contract." 495 U.S. at 373, 110 S.Ct. at 1911. In *Rawson*, the plaintiffs, survivors of the employees, argued that the union had contractually assumed greater duties to the employees, under the terms of the collective bargaining agreement, than otherwise required by the duty of fair representation. The Court, acknowledging that such enhanced duties were possible, held that the collective bargaining agreement, negotiated between the union and the employer, did not create rights directly enforceable by the individual employees against the union. *Id.* 495 U.S. at 373–75, 110 S.Ct. at 1912. The Court also held that the plaintiffs' state claims were preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), which requires that federal law be applied to legal actions requiring interpretation of a collective bargaining agreement. *Id.* 495 U.S. at 368–72, 110 S.Ct. at 1909–11.

Plaintiffs in the instant case argue that *Rawson*, by negative implication, supports their position that the Fragmentation Policy is a promise enforceable against ALPA through a state law action for breach of contract or detrimental reliance. The crux of plaintiff's argument is that the Fragmentation Policy, unlike the alleged prom-

ises in *Rawson*, was a promise made by the Union directly to the employees, rather than an agreement between the Union and the employer with only incidental benefit to the employees. Thus, if the plaintiffs' allegations are taken as true, the Fragmentation Policy would be enforceable directly by the employees, rather than by the Union, as in *Rawson*. Similarly, the preemption analysis in *Rawson* would not be applicable. The alleged contractual duties in the present case do not flow from the collective bargaining agreement and, thus, could not be preempted by § 301 of the LMRA. Even more fundamentally, § 301 is not applicable to industries subject to the RLA, and there is no analogous provision under the RLA statutory framework. Thus, there can be no preemption on the *Rawson* theory.

Also arguably supportive of the plaintiff's position is *International Brotherhood of Electrical Workers, AFL–CIO v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987). In *Hechler* the Court held that, while the employer was the party primarily responsible for ensuring a safe work place, "[a]nother party, *such as a labor union*, ... may assume a responsibility towards employees by accepting a duty of care through a contractual arrangement." *Id.* at 860, 107 S.Ct. at 2167 (emphasis added). The *Hechler* Court followed this statement by noting, "If a party breaches a contractual duty, the settled rule under [state] law is that the aggrieved party may bring either an action for breach of contract or a tort action for injuries suffered as a result of the contractual breach." *Id.* The state claims in *Hechler* were ultimately found to be preempted, as in *Rawson*, by § 301 of the LMRA because the alleged contractually assumed duties were premised on, and required interpretation of, a collective bargaining agreement. The *Hechler* Court specifically mentioned that it was not presented with the question of whether "the Union possibly was subject to an independent state-law duty of care, unconnected to the collective-bargaining agreement ... [which] could survive the

---

4. The Fragmentation Policy, according to plain-

tiffs, constituted such an enforceable promise.

pre-emptive power of federal labor law." *Id.* at 862 n. 5, 107 S.Ct. at 2168 n. 5.

Finally, plaintiffs cite to the case most factually similar to the instant case: *Richardson v. United Steelworkers of America,* 864 F.2d 1162 (5th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990). In that case, employees sued their union for failure to warn them, prior to their strike, that their employer had a statutory right to replace them. Plaintiffs there attempted to base their claim on the Texas common law of tort, because the six-month statute of limitations applicable to a federal duty of fair representation action would have been fatal to a federal claim. The attempt failed as the court ruled that the state claims were preempted by the federal duty of fair representation. Significantly, however, the *Richardson* court, noting the *Hechler* language referring to the possibility of " 'an independent state-law duty of care,' " carefully circumscribed its holding, pointing out that the "plaintiffs did not allege any breach of a state tort duty that exists independently of the NLRA-established collective bargaining relationship...." *Id.* at 1167.

In sum, while no court has ever found that a union has contractually obligated itself to duties above and beyond the duty of fair representation, the relevant precedent has strongly implied that, under the proper set of circumstances, a union could so obligate itself, and that it could be sued under state law for breach of those obligations. Assuming, *arguendo,* that a union may voluntarily assume some duties in excess of the duty of fair representation, the question remains whether the duties alleged by plaintiffs in this case are of the sort for which a union should be held responsible, under state law, for breach.

The duties plaintiffs allege that the Union owed to them in Counts II, III, and IV,

all involve the obligation to negotiate (or to avoid interference with negotiations) between the plaintiffs and the carriers that acquired Eastern's assets. In essence, the claim in each of these counts is that the plaintiffs were not fairly represented by the Union. From this, preemption follows for it seems apparent that even though it is possible for a union to assume duties in excess of the duty of fair representation, such duties cannot be mere refinements of what constitutes the duty of fair representation. In other words, the additional duties cannot define bargaining positions the union must take or parties with whom the union must negotiate in its representational capacity for the union members. Duties of this nature would conflict with, rather than supplement, the federal duty of fair representation. *See Vaca,* 386 U.S. at 180, 87 S.Ct. at 911–12 ("the decision to preempt ... must depend on the nature of the particular interests being asserted and the effect upon the administration of national labor policy"); *c.f., Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 297, 97 S.Ct. 1056, 1062, 51 L.Ed.2d 338 (1977) (preemption not necessary " 'where the particular rule of law sought to be invoked ... is so structured and administered that, in virtually all instances, it is safe to presume that [implementation] will not disserve the interests promoted by the federal labor statutes.' " (*quoting Lockridge,* 403 U.S. at 297–98, 91 S.Ct. at 1923 (1971))).[5] The supplemental duties contemplated by *Rawson* and *Hechler* had nothing to do with additional representational functions undertaken by the unions. Instead, those cases dealt with obligations, assumed by the respective unions, to inspect work environments for unsafe conditions. Those duties are sufficiently separate and distinct from the duty of fair representation so as not to conflict or interfere with implementation of that doctrine. The same cannot

---

**5.** The quoted statements in *Vaca* and *Farmer* were both made with respect to preemption of a judicial remedy by the exclusive jurisdiction of the NLRB. As noted above, preemption on jurisdictional grounds is a distinct concept from federal preemption of substantive state law, and the legal rationale from the jurisdictional cases may or may not have applicability in the substantive law context. In this case, the principles of preemption are stated with such generality that it is difficult to discern any reason why the statements should not also apply to the preemption of state substantive law.

be said for the duties that plaintiffs would impose on ALPA in the present case. Because the duties urged by the plaintiffs infringe on an area that "can hardly be called a peripheral concern to federal labor law," *Peterson*, 759 F.2d at 1169, the Court finds that the plaintiffs' state law claims must be preempted.[6]

For the foregoing reasons, the Court grants the defendants' motion to dismiss Counts II, III, and IV of the plaintiffs' First Amended Complaint.

An appropriate order will issue.

---

**6.** Note, however, that preemption of the state law claims does not mean that the conduct forming the basis of those claims is irrelevant to the alleged breach of the federal duty of fair representation. To the contrary, evidence that ALPA (1) failed to honor a pre-existing negotiation policy, (2) made promises to the plaintiffs, inducing the plaintiffs to strike, and then reneged on those promises, or (3) interfered with the plaintiffs' efforts to gain employment with other carriers, might well be relevant to whether ALPA's actions with respect to plaintiffs were "arbitrary, discriminatory or in bad faith." *Rawson*, 495 U.S. at 372, 110 S.Ct. at 1911 (internal quotation omitted).